**IN THE UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF LOUISIANA**

**GERALDINE BILLUPS**

                   Plaintiff

VERSUS

**EXACTECH, INC.**

                  Defendant

**Civil Action No.: 2:22-cv-01410**

**Judge: Sarah S. Vance**

**Magistrate Judge: Michael North**

**PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO EXACTECH'S MOTION TO DISMISS**

**MAY IT PLEASE THE COURT:**

**INTRODUCTION**

Plaintiff, Geraldine Billups, submits this opposition to the Motion to Dismiss filed by defendant, Exactech, Inc. Defendant seeks a dismissal of the Louisiana Products Liability Act ("LPLA") claims, asserting prescription and a failure to state a claim.

The defendant also seeks dismissal of the plaintiff's claim for a violation of the Louisiana Unfair Trade Practices Act ("LUTPA").  The plaintiff waives her claim under the LUTPA.

This opposition will respond to the defendant's meritless assertions of prescription and failure to state a claim under the LPLA.

**SUMMARY OF THE ARGUMENT**

This Honorable Court, in *Ellis,*[1] cited the legal standards to survive a Rule 12(b)(6) motion to dismiss. A plaintiff must plead specific facts, not conclusory allegations, and state a plausible claim. A claim is facially plausible when the plaintiff pleads factual content that

reasonably infers the defendant is liable for the alleged misconduct. The well-pled facts in the Complaint are accepted as true for purposes of the Motion to Dismiss. The Court may consider documentary evidence if it was referenced in the Complaint. In addition to facts alleged in the pleadings, however, the district court may also consider matters of which [it] may take judicial notice.

Further, in *Ellis*, this Honorable Court considered the doctrine of *contra non valentem* as an exception to prescription rules. Under Louisiana law, *contra non valentem* is a doctrine that tolls the statute of limitations, and is thus "an exception to the general rules of prescription." This doctrine suspends the prescriptive period under certain circumstances, including situations in which the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant. Courts assessing the applicability of *contra non valentem* must focus on the reasonableness of the tort victim's action or inaction.

The Complaint in this case include facts both specific to the date Geraldine Billups could reasonably know of the defects in the Exactech Optetrak Knee, and to facts sufficient to support the LPLA claims regarding the recalled Optetrak knee device and the defective tibial tray, including:

1. The identity of Exactech as the manufacturer of the Optetrak Comprehensive Knee System including the finned tibial tray;

2. The early onset of complaints to the FDA for premature loosening and failure of the Optetrak Knee System, including the finned tray [2]

---

[1] *Ellis v. Evonik Corporation.,* No.21-CV-1089, 2021 WL 17191996 at, ,2 (Vance, J.)

[2] See **Exhibit 1,** FDA Maude listing for 2017-2022, the five years available by online search, for loosening of the Optetrak knee and the tibial tray. See also, **Exhibit 2,** representative Finned Tibial Tray Maude reports, 2013-2017; See also **Exhibit 3**, representative Optetrak Knee FDA Maude reports

3.  That, despite knowledge of the increasing complaints of premature loosening and failure, Exactech marketed the Opterak knee by touting its "overall longevity." [3]

4.  The FDA Class 2 Device Recall of the Optetrak Comprehensive Knee System, first posted October 24, 2021, because the knee inserts were packaged in vacuum bags that lacked an additional oxygen barrier layer, resulting in oxidation of the plastic components and premature failure. The updated notice includes the expanded recall by the manufacturer on February 7, 2022 to include all Optetrack Knee Systems implanted since 2004. [4]

5.  The February 7, 2022 form letter from Exactech to medical providers to send to patients, with the attached March 17, 2022 letter from Dr. Chimento to Ms. Billups.[5]   In their letter, Exactech states that, during "a recent review" of the knee implant manufacturing process, it learned that the lack of the additional oxygen barrier could cause the plastic insert component to oxidize and fail prematurely after implant or to become damaged after implant. Dr. Chimento's letter to Ms. Billups identified her as a patient receiving the recalled knee device.

6.  The April 7, 2022, Exactech Urgent Medical Device Correction [6], which expanded the recall to all Opetrak Knee Systems manufactured and sold between 2004 and 2022, regardless of shelf-life, and informed health care professionals that:

> After extensive testing, we have confirmed that most of our inserts
> manufactured since 2004 were packaged in out-of-specification (referred
> to hereafter as "nonconforming") vacuum bags that are oxygen resistant

---

[3] See **Exhibit 4,** 2012 marketing materials for the Exactech Optetrak Knee System;
[4] See **Exhib**it **5,** FDA Class 2 Device Recall, as referenced in the Complaint.
[5] See **Exhibit 6**, in globo,, the  February 7, 2022 Exactech form letter to patients and the March 17, 2022 letter to the plaintiff, previously identified as Exhibit 1 to the Complaint.
[6] See **Exhibit 7**, Urgent Medical Device Correction, referenced in the Complaint, expanding the recall which the FDA advised occurred February 7, 2022, but the Notice is dated April 7, 2022.

but do not contain a secondary barrier layer containing ethylene vinyl alcohol (EVOH) that further augments oxygen resistance. **The use of these non-conforming bags may enable increased oxygen diffusion to the UHMWPE (ultra-high molecular weight polyethylene) insert, resulting in increased oxidation of the material relative to inserts packaged with the specified additional oxygen barrier layer. Over time, oxidation can severely degrade the mechanical properties of conventional UHMWPE, which, in conjunction with other surgical factors, can lead to both accelerated wear debris production and bone loss, and/or component fatigue cracking/fracture, all leading to corrective revision surgery.**

7.  The extent of the injuries caused by the recalled plastic insert in the Optetrak Knee System. Plaintiff was subjected to three consecutive premature failures of her right knee replacements resulting in five additional procedures:

| Date | Reason | Surgery |
|---|---|---|
| 06/08/2006 | | Primary TKA surgery |
| 10/28/2008 | Loosening | Removal surgery with antibiotic spacer |
| 02/03/2009 | | Revision TKA implantation |
| 10/18/2012 | Loosening | Revision TKA, partial |
| 03/25/2021 | Loosening | Revision TKA, complete |
| 03/23/2021 | Complication | Popliteal artery and vein repairs |

8.  Ms. Billups' 2006 implant included not only the recalled plastic insert, but also a defective Finned Tibial Tray, which was quickly replaced by Exactech with another design after it received multiple complaints. Exactech allegedly hid the problem from the FDA, public and providers. A finned tibial tray sealed Whistleblower suit was filed district court in Alabama in 2018 regarding the finned tibial tray complaints and Exactech's failure to disclose, opting instead for a "silent recall" of the finned tray, replaced by a trapezoid tray.

Exactech contends that Ms. Billups had "constructive" notice of her product liability claims for Exactech's defective and recalled polyethylene implants because she had revision and removal surgeries more than one year before filing her lawsuit. However, Exactech's focus on

the occurrence of Ms. Billups's injuries and/or revision surgeries, alone, does not accurately reflect when prescription began to run in this case.

The alleged facts support a finding that Ms. Billups' surgeon, Dr. George Chimento, first learned of the recall in February, 2022, and then provided notice to the plaintiff in March, 2022. Further, Exactech asserts in its February 2022 notice letter that it had only "recently learned" of the problem with the oxidation of the plastic insert. To claim that Ms. Billups could or should have known of the defect prior to notice to her surgeon and then to her is specious, at best.

The plaintiff's claims are not prescribed. Ms. Billups did her "due diligence" when the knee failed after just two years. The Complaint references the 2008 Ochsner medical record for the plaintiff's knee revision surgery due to "failed right total knee replacement with a loose tibial component." Included in the referenced medical record is a provider note from Ms. Billups' surgeon, Dr. George Chimento. Dr. Chimento states that Ms. Billups "had several concerns" about the component choice, but Dr. Chimento assured her that "I do not see that there is any overall problem with the prosthesis," and that he had "complete faith in the Optetrak system." [7] Ms. Billups asked the right question. She is entitled to rely upon the assurances of the learned intermediary, Dr. Chimento.

The plaintiff has presented a plausible argument on each LPLA claim. In this case, Optetrak has identified through its recall notices the specific manufacturing and design defects in its Optetrak knee device. Specifically, that "most of our inserts manufactured since 2004 were packaged in out-of-specification (referred to hereafter as "nonconforming") vacuum bags that are oxygen resistant but do not contain a secondary barrier layer containing ethylene vinyl alcohol (EVOH) that further augments oxygen resistance." The use of the non-conforming bags "resulted

"in increased oxidation of the material relative to inserts packaged with the specified additional oxygen barrier layer. Over time, oxidation can severely degrade the mechanical properties of conventional UHMWPE, which, in conjunction with other surgical factors, can lead to both accelerated wear debris production and bone loss, and/or component fatigue cracking/fracture, all leading to corrective revision surgery."

Exactech marketed the Opetrak Knee for its "performance over time" despite its knowledge of an unusually high number of complaints to the FDA of premature loosening. There were no safety warnings prior to the recall. The plaintiff has alleged facts that the Optetrak knee, and the first tibial tray used with the knee, the finned tray, deviated from normal production and design standards, resulting in a product that is unreasonably dangerous in use and caused the plaintiff's injuries Plaintiff has met her "plausibility" burden, and respectfully requests this Honorable Court deny the Motion to Dismiss.

## **LEGAL STANDARD**

### 1)  *Burden of Proof*

On a motion to dismiss, all well-pleaded allegations are accepted as true and viewed in the light most favorable to the nonmovant. *See In re S. Scrap Material Co.,* 541 F.3d 584, 587 (5th Cir.2008). To avoid dismissal, a plaintiff must state a claim for relief that is facially plausible by pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). A complaint is insufficient if it offers only "labels and conclusions," or "a formulaic recitation of the elements of a cause of action." *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

---

[7] See **Exhibit 8**, Dr. Chimento's 2008 Provider Note

On a motion to dismiss, when the cause of action requires specific elements to be proven, the plausibility standard "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements." *In re S. Scrap Material Co.,* 541 F.3d at 587 (quoting *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955).

The district court must limit its review to the contents of the pleadings, including attachments. *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014). The district court may also consider documents attached to a *motion to dismiss* or an opposition to that motion when the documents are referred to in the pleadings and are central to a plaintiff's claims. *Id.* "In addition to facts alleged in the pleadings, however, the district court may also consider matters of which [it] may take judicial notice." *Hall v. Hodgkins*, 305 F. App'x 224, 227 (5th Cir. 2008) (citing *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017-18 (5th Cir. 1996)).

In *Flagg v. Stryker,* 647 Fed. Appx. 314 (5th Cir. 2016), the Fifth Circuit noted that the Circuit had never squarely addressed how much detail and specificity is required to plead that a product is unreasonably dangerous under the LPLA due to defective design, construction or composition. Reversing the trial courts grant of a motion to dismiss, the *Flagg* court found that requiring plaintiffs to plead extremely "detailed factual allegations" that satisfy each element of a products liability action under the Louisiana Products Liability Act ("LPLA") creates a situation where a manufacturer will not be held liable for defective products because it has sole possession of the necessary documents to ultimately prove the claim. *Id* at 317; *See also, Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (noting that pleadings need not contain "detailed factual allegations" (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955)); *see also Bertrand v. Eli Lilly & Co.,* No. 12–0853, 2013 WL 4093556, at 5 (W.D.La. Aug. 13, 2013) (noting plaintiffs in products liability

suits face a likely impossible task of stating more specific allegations about manufacturing and design when the defendants have possession of the necessary information.)

### 2) *Prescription/Contra Non Valentem*

Article 3492 of the Louisiana Civil Code provides that "[d]elictual actions are subject to a liberative prescription of one year." La. Civ. Code art. 3492. This period "commences to run from the day injury or damage is sustained." *Id.*; *see also Brown v. R.J. Reynolds Tobacco Co.*, 52 F.3d 524, 527 (5th Cir. 1995) (quoting La. Civ. Code art. 3492). "Damage is considered to have been sustained, within the meaning of the article, only when it has manifested itself with sufficient certainty to support accrual of a cause of action." *Cole v. Celotex Corp.*, 620 So. 2d 1154, 1156 (La. 1993) (citing *McCray v. N.E. Ins. Co.*, 579 So. 2d 1156 (La. App. 2 Cir. 1991)). Similarly, survival and wrongful-death actions are subject to a prescriptive period of one year from the date of death. La. Civ. Code art. 2315.1(A) (governing survival actions); La. Civ. Code art. 2315.2(B) (governing wrongful-death actions).

Here, Ms. Billups' complaint identifies the date of constructive notice sufficient to commence the running of prescription as March 17, 2022, (just two months prior to the filing of suit), when Dr. Chimento sent her a letter with the Exactech recall information and advised her that she had received the recalled knee. Exactech argues prescription began to run on March 25, 2021, the date of Ms. Billups' last knee surgery and fourteen (14) months prior to filing suit. Plaintiff disputes this proposition, asserting the doctrine of *contra non valentem.*

The jurisprudential doctrine of *contra non valentem* is an exception to the statutory rule and operates as a means of suspending the running of prescription when the circumstances of a case fall within one of four categories. *Wells v. Zadeck,* 11–1232 (La.3/30/12); 89 So.3d 1145, 1150. The Louisiana Supreme Court has explained that the doctrine of *contra non valentem* "is

8

used to soften the occasional harshness of prescriptive statutes." *Id.* Nevertheless, the Supreme Court has cautioned that the doctrine only applies in exceptional circumstances. *Renfroe v. State ex rel. Dept. of Transp. and Development,* 01–1646 (La.2/26/02); 809 So.2d 947, 953.

*Contra non valentem* applies in four factual situations to prevent the running of prescription: (1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action; (2) where there was some condition coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting; (3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; and (4) where the cause of action is not known or reasonably knowable by the plaintiff, even though this ignorance is not induced by the defendant. These categories allow "the courts to weigh the 'equitable nature of the circumstances in each individual case' to determine whether prescription will be tolled." *Wells, supra* at 1150, quoting *Plaquemines Parish Commission Council,* 502 So.2d 1034, 1054–55 (La.1987).

The fourth category, also known as the discovery rule, "prevents the running of liberative prescription where the cause of action is not known or reasonably knowable by the plaintiff." *Cole v. Celotex Corp.*, 620 So.2d 1154, 1156 (La.1993). Under this category of *contra non valentem,* prescription begins to run when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he is the victim of a tort. *Campo v. Correa,* 01–2707 (La.6/21/02); 828 So.2d 502, 510. Constructive knowledge is "whatever notice is enough to excite attention and put the injured party on guard and call for inquiry." *Id.* at 510–11. "Prescription will not begin to run at the earliest indication that a plaintiff may have suffered some wrong." *Cole*, 620 So.2d at 1157.

The Louisiana Supreme Court has observed the difficulty in identifying the precise point

in time at which a claimant becomes aware of sufficient facts to begin the running of prescription and has explained that when prescription begins to run depends on the reasonableness of a plaintiff's action or inaction. Id. "[T]he ultimate issue in determining whether a plaintiff had constructive knowledge sufficient to commence a prescriptive period is the reasonableness of the plaintiff's action or inaction in light of his education, intelligence, and the nature of the defendant's conduct." *Marin v. Exxon Mobil Corp.,* 09–2368 (La.10/19/10); 48 So.3d 234, 246. *Contra non valentem* will not apply to exempt a plaintiff's claim from the running of prescription "if his ignorance is attributable to his own willfulness or neglect; that is, a plaintiff will be deemed to know what he could by reasonable diligence have learned." *Id.*

## FACTUAL BACKGROUND

In 2006, the plaintiff sought treatment at Ochsner Medical Center for knee pain. At the recommendation of the orthopedic surgeon, she underwent knee replacement surgery on her right knee with an Optetrak Knee Replacement System, including the defective insert and defective tibial tray. In 2008, less than two years after her knee replacement surgery, Ms. Billups developed loosening of the device and pain in her right knee. On October 28, 2008, the plaintiff underwent a surgical revision of her right knee due to "failed right total knee with a loose tibial component." At the time of surgery, it was discovered that Ms. Billups' right knee was also infected and, therefore, the Optetrak Knee Replacement System and its components were removed while she underwent treatment for the infection.

Mrs. Billups' Optetrak knee prematurely failed after just two years. Mrs. Billups was concerned and asked her surgeon if there was a problem with the knee device. Dr. George Chimento, in a 2008 Provider Note, reassured Ms. Billups that there was no problem with the device:

"She has several concerns regarding the component choice. I explained to her that very comfortable using the Exactech Optetrak with the trapezoidal tray rather than the cruciform tray. I have been doing this for 8 years and had a couple of at least 200 implanted and she is only the only failure I have had due to aseptic loosening. I believe that the cruciform design may not have been the best choice for her.  I do not see if there is any overall problem with the prosthesis, we will treat the fracture in general.   She is quite concerned about this, which is unfortunately a sign of hard times. Once again, I have complete faith in the Optetrak system, and we will proceed using the Exactech Optetrak knee for her primary and revision."

**Exhibit 8,** Dr. Chimento Provider Note

The cruciform tray referenced by Dr. Chimento is also known as the "finned" tibial tray. Dr. Chimento did not use this finned tray for the revision surgery. According to the FDA Maude website, referenced in the Complaint, hundreds of complaints were submitted beginning in 2004 regarding the failure of the finned tray. It did not fit well with the other components.

The plaintiff continued treatment for the infection until February 3, 2009, when another Optetrak Knee Replacement System was implanted in her right knee at Ochsner Medical Center.

The plaintiff continued to have pain and instability in connection with her Optetrak Knee Replacement System and, in October 2012, it was determined that the device had again loosened and failed, and that, therefore, she was required to undergo another revision.  On October 18, 2012, surgery was once again performed on Mrs. Billups right knee.  During this revision, another defective insert was implanted in her knee.

Ms. Billups continued to have difficulty with her right knee, and, in March 2021, she underwent another revision at Tulane Hospital due to loosening and bone loss related to the defective insert.  As a result of this revision surgery, the plaintiff's popliteal artery was severed, and the plaintiff continues to suffer from medical complications and risks. In total, the plaintiff

was subjected to three consecutive premature failures of her right knee replacements resulting in five additional procedures:

| Date | Reason | Surgery |
| --- | --- | --- |
| 06/08/2006 | | Primary TKA surgery |
| 10/28/2008 | Loosening | Removal surgery with antibiotic spacer |
| 02/03/2009 | | Revision TKA implantation |
| 10/18/2012 | Loosening | Revision TKA, partial |
| 03/25/2021 | Loosening | Revision TKA, complete |
| 03/23/2021 | Complication | Popliteal artery and vein repairs |

In August 30, 2021, Exactech issued a partial recall of the Optetrak polyethylene inserts implanted between 2004 and 2022, labeled with a certain limited shelf life.  That partial recall stated that "inserts were packaged in vacuum bags that lacked an additional oxygen barrier layer." Then, on February 7, 2022, Defendant expanded its recall, regardless of shelf-life, and issued an "Urgent Medical Device Correction" which informed health care professionals that:

> After extensive testing, we have confirmed that most of our inserts manufactured since 2004 were packaged in out-of-specification (referred to hereafter as "nonconforming") vacuum bags that are oxygen resistant but do not contain a secondary barrier layer containing ethylene vinyl alcohol (EVOH) that further augments oxygen resistance. **The use of these non-conforming bags may enable increased oxygen diffusion to the UHMWPE (ultra-high molecular weight polyethylene) insert, resulting in increased oxidation of the material relative to inserts packaged with the specified additional oxygen barrier layer. Over time, oxidation can severely degrade the mechanical properties of conventional UHMWPE, which, in conjunction with other surgical factors, can lead to both accelerated wear debris production and bone loss, and/or component fatigue cracking/fracture, all leading to corrective revision surgery.**

On March 17, 2022, in response to the recall, Ochsner Medical Center advised all their patients who had been implanted with an Optetrak, including Mrs. Billups, that Exactech had issued a recall of all of its polyethylene inserts, including the ones implanted in Plaintiff. According to Ochsner:

> "Exactech learned that one of the packaging layers for the plastic insert

has been out of specification and may allow oxygen from the air to diffuse into the plastic insert prior to it being implanted in your knee.  If a large amount of oxygen diffuses into the plastic insert while it's being stored and before it is implanted, this can lead to a process called oxidation, which can cause the plastic to wear out earlier than expected or to become damages after it is implanted into the patient's body."

Exactech also reported in its notification letter that:

"Premature wear of the plastic insert of your knee replacement can lead to the need for additional surgery (also known as revision surgery)."

Exactech had obtained FDA 510(k) clearance under the Medical Device Amendments of 1976 to the Food Device Cosmetic Act (MDA) for sale and distribution of the Optetrak Knee Replacement System during the years 2004-2022. This type of clearance did not involve clinical testing by the FDA for safety and effectiveness or quality control of the Optetrak Knee Replacement System or any of its components.

Exactech retained sole responsibility for safety and effectiveness of the Optetrak Knee Replacement System, specifically during the times when it was marketed and sold with the defective insert and during the time it was marketed with defective finned tray. Exactech promoted the Optetrak as a system with three decades of clinical success and proven outcomes because of the improved design resulting in low stress on the polyethylene inserts.

Exactech claimed in its recall notice letter that it had only recently learned that the non-specification, non-conforming vacuum bags resulted in oxidation of the polyethylene components, further resulting in premature loosening and failure of the knee. But Exactech cited studies published in Australia and New Zealand in 2020 and 2021. While those studies reviewed early onset FDA complaints and Maude reports reflecting an unusually high incidence of failures years ago, they did not identify the cause of the problem. Exactech alone knew of the vacuum bag problem much earlier than 2022, before Exactech admitted in its recall notice that the knee

device is defective.

## ANALYSIS

### *Prescription/Contra Non Valentem*

Prescription commences when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or **she is a victim of a tort, damage occurred because of that tort, and the defendant's negligence caused the damage**. (Emphasis added.) *Oil Ins. Ltd. V. Dow Chemical Co.*, 977 So.2d 18 (La. Ct. App. 1st Cir. 2007); *Percy v. State E.A. Conway Memorial Hosp.*, 478 So.2d 570 (La. App.  Cir. 1985).

Plaintiff alleges that she did not have actual or constructive knowledge that she was the victim of a tort, resulting from Exactech's defective products until she received the recall notice by virtue of the March 17, 2022 letter from Ochsner. (Exhibit 1 to Complaint.)

Ms. Billups has asserted *contra non valentem*, which means that prescription does not run against a person who could not bring her suit.  *Carter v. Haygood,* 892 So.2d 1261 (La. 1/19/05). "*Contra non valentem* is a Louisiana jurisprudential doctrine under which prescription may be suspended." (*Id.*) There are four general categories of contra non valentem.  Plaintiff asserts that Category (3) and Category (4) apply to her case.  Category 3 states: "where the debtor himself has done some act effectively to prevent the creditor from availing himself of his cause of action. Category (4) states: "where the cause of action is not known or reasonably knowledgeable by the plaintiff even though this ignorance is not endured by the defendant." (See, pg. 8 of Plaintiff's Complaint)

In support of her claim of *contra non valentem*, Plaintiff attached to her Complaint Exactech's recall notice contained in the letter from Ochsner to Ms. Billups, dated March 17, 2022.  In its letter Ochsner advised Ms. Billups that Exactech had sent Ochsner a letter on

February 7, 2022 notifying it of the recall of the polyethylene insert contained in its knee replacement systems, including all Optetrak inserts. In the February 7, 2022 letter from Exactech to Ochsner, Exactech stated that: "During a recent review of its knee implant manufacturing process Exactech learned that one of the packaging layers for the plastic insert has been out of specification", which can lead to damage and "additional surgery (also known as revision surgery)".

Exactech then published an "Urgent Medical Device Correction" on April 7, 2022 informing the surgeons of Exactech knee systems of the precise dangers associated with the Exactech (Optetrak) insert, specifically "loosening, lysis (bone loss) and pain." All the notices were well within a year of Ms. Billups' Complaint.  Clearly, prior to this recall notice, Ms. Billups could not have had actual or constructive knowledge of the dangers associated with Defendant's polyethylene insert. Even Exactech asserts in its recall notices that it only learned of the "out of specification" packaging "during a **recent review** of its implant manufacturing process" in 2022. (Emphasis added.)  There is simply no evidence or indication from any other source that there were dangers associated with the Optetrak polyethylene insert.

Regarding the finned tibial tray, Plaintiff has specifically raised the third category of *contra non valentem* when she alleged in her Complaint at pg. 8, paragraph 31, that Exactech intentionally concealed from both Plaintiff and her health care professionals the unreasonable dangers and serious risks of injuries caused by use of the tibial tray.  Although Exactech argues that Ms. Billups did not explain the tibial tray's defect in sufficient detail, this is meritless.  On page 10, paragraph 47, Plaintiff set forth the danger of the tray to fail when used with a size three femur in combination with a size three tray, as in plaintiff's implant surgery because there is inadequate bone support.

15

Prescription does not commence until a plaintiff obtains actual or constructive knowledge of facts that would indicate to a reasonable person that he is the victim of a tort, damage occurred, and the defendant's negligence caused the damage.  Constructive knowledge consists of knowledge of the facts sufficient to excite curiosity, to excite attention, or to put a reasonably minded person on guard and call for an inquiry." *Cole Id.*  In this case, Ms. Billups acted as a reasonably minded person when, at the time the finned tray was prematurely removed by her orthopedic surgeon, Dr. George Chimento, she inquired whether the problem could be related to the knee implant.  And, as reflected in Dr. Chimento's medical records he stated:

> "I believe that the cruciform design (finned tray) may not have been the best choice for her.  I do not see if there is any overall problem with the prosthesis, we will treat the fracture in general. She is quite concerned about this, which is unfortunately a sign of hard times.  Once again, I have complete faith in the Optetrak system, and we will proceed using the Exactech Optetrak knee for her primary and revision."

Inquiring of her orthopedic surgeon and relying on his assurance, was an entirely reasonable inquiry to make for purposes of the discovery rule, to prevent running of prescription, the overriding issue is the reasonableness of plaintiff's act. *See Cole v. Celotex*, 620 So. 2d 1154, 1157 (La. 1993) (applying *contra non valentem* to the period when plaintiff "was told by [his doctor] that the findings on his chest x-ray could be the result of several causes *besides asbestosis*,") and finding that prescription started when the plaintiff was eventually diagnosed with asbestosis years later.

Here, Dr. Chimento told Ms. Billups that her revision was not due to the knee replacement components.

### Claims Under the Louisiana Products Liability Act

The Louisiana Products Liability Act sets forth four theories under which plaintiff can

16

establish that a product is unreasonably dangerous:

(1)     The product is unreasonably dangerous in construction or composition as provided in R.S. 9:2800.55;

(2)     The product is unreasonably dangerous in design as provided in R.S. 9:2800.56;

(3)     The product is unreasonably dangerous because an adequate warning about the product has not been provided in R.S. 9:2800.57; or

(4)     The product is unreasonably dangerous because it does not conform to an express warranty of the manufacturer about the product as provided in R.S. 9:2800.58.

One way to maintain a construction or composition claim under the LPLA, is to demonstrate that, at the time the product left the manufacturer's control, the product deviated in a material way from the manufacturer's specifications. (R.S. 9:2800.55).

Plaintiff alleged at page 8 of her Complaint that the Optetrak Knee Implant System was "unreasonably dangerous in composition".  At page 6 of her Complaint, Plaintiff alleged that the Defendant's product **"was being packaged in bags that did not comply with its own specifications for protection.".** (Emphasis added).  Plaintiff further alleged that this failure to comply with its own specifications "increased the particle burden which contributed to loosening and bone loss in all of her successive failed knee replacements."  In its recall notice regarding the polyethylene inserts, recited on page 5 of Plaintiff's Complaint, Exactech admits that, since 2004, their inserts were "packaged in out-of-specification (referred to hereafter as non-conforming) vacuum bags that are oxygen resistant but do not contain secondary barrier layer containing ethylene vinyl alcohol (EVOH) that further augments resistance."  The recall further noted that this out-of-specification packaging "can lead to both accelerated wear debris production and bone loss, and/or component fatigue cracking/failure, all leading to corrective

revision surgery."  Plaintiff alleged on page 4 of her Complaint that she underwent three revision surgeries due to loosening and bone loss "all injuries related to the defective insert."

***Unreasonably Dangerous Because of Inadequate Warning***

A product is unreasonably dangerous under the LPLA if (3) the product is unreasonably dangerous because an inadequate warning about the product. (R.S. 9:2800.57)

Plaintiff alleged in her Complaint, page 10, paragraph 47:

> "In particular, Defendant failed to adequately disclose the danger of the defective tibial tray, particularly when used with a size three femur in combination with a size three tray, as in Plaintiff's implant surgery, given its propensity to undergo substantial early failure due to component loosening, tissue damage, bone loss, osteolysis, other complications, as well as the need for revision surgery."

Plaintiff's allegation was very specific on this issue. On page 10, paragraph 48, Mrs. Billups alleged that this specific failure to warn resulted in her injuries. Further, the marketing materials contain no warning, and the February, 2022 notice to providers was the first notice to physicians, despite Exactech's knowledge of an unprecedented number of complaints to the FDA about the product dating back a decade.

In particular, Exactech failed to adequately disclose the danger of the defective tibial tray, particularly when used with a size three femur in combination with a size three tray, as in Plaintiff's implant surgery, given its propensity to undergo substantial early failure due to component loosening, tissue damage, bone loss, osteolysis, other complications, as well as the need for revision surgery.

***Learned Intermediary***

Under the LPLA, in order to prove that a product is unreasonably dangerous because of an inadequate warning, a plaintiff must prove that the product has a potentially damage-causing

characteristic and that the manufacturer failed to use reasonable care to provide an adequate warning about this characteristic. *Stahl v. Novartis Pharmaceuticals Corp.,* 283 F.3d 254, 261 (5th Cir.2002) at 264. There is no dispute that the product has a potentially damage-causing characteristic. The facts support a finding that Exactech failed to use reasonable care to provide an adequate warning.

In claims involving drugs or medical devices, which are dispensed by a physician, Louisiana law applies the learned intermediary doctrine. *Id.* at 265. The learned intermediary is the one to whom the warning is directed and is the one who makes the decision whether to use the product. The manufacturer has the duty to warn the intermediary of inherent dangers not within the knowledge of or obvious to the average intermediary. *Zachary v. Dow Corning Corp.,* 884 F.Supp. 1061, 1065 (M.D.La.1995); *Stahl,* 283 F.3d at 265–66. Therefore, in the learned intermediary context, the plaintiff must show that the defendant failed to warn or inadequately warned the physician of a risk associated with the product that was not otherwise known to the physician. Second, the plaintiff must show that this failure to warn the physician was both a cause in fact and the proximate cause of the plaintiff's injury. *Id.; Willett v. Baxter Int'l Inc.,* 929 F.2d 1094, 1098 (5th Cir.1991).

In this case, Plaintiff has alleged that the Ochsner orthopedic surgeon repeatedly implanted the polyethylene insert that resulted in repeated revisions. (See page 4 of Complaint). Plaintiff also specifically alleged on page 7, paragraph 24,

> "Upon information and belief, Defendant received numerous reports of adverse events relating to injuries caused by the defective tibial tray but failed to report these events in violation of FDA's requirements in reporting adverse events." (21 C.F.R. 803)

On page 3, paragraph 12 of her Complaint, Mrs. Billups alleged that the reports of

loosening and bone loss related to the tibial tray were not reported by Exactech to the orthopedic surgeons.   There is simply no reason to believe that the orthopedic surgeon would have intentionally implanted the tray or repeatedly implanted the polyethylene insert that was out-of-specification had he been properly warned.

***Manufacturing and Composition defect***

The Optetrck knee was unreasonably dangerous as manufactured, packaged, distributed, and marketed. The fact cannot be disputed. Exactech admits to the manufacturing, packaging, distribution and marketing defect in its recall notices. The April 7, 2022 Exactech Urgent Medical Device Correction [8] expanded the recall to all Opetrak Knee Systems manufactured and sold between 2004 and 2022, regardless of shelf-life, informed health care professionals and states:

"After extensive testing, we have confirmed that *most of our inserts manufactured since 2004 were packaged in out-of-specification (referred to hereafter as "nonconforming") vacuum bags that are oxygen resistant but do not contain a secondary barrier layer containing ethylene vinyl alcohol (EVOH) that further augments oxygen resistance*. The use of these non-conforming bags may enable increased oxygen diffusion to the UHMWPE (ultra-high molecular weight polyethylene) insert, resulting in increased oxidation of the material relative to inserts packaged with the specified additional oxygen barrier layer."

Mrs. Billups' manufacturing defect claim under the LPLA is much more than just plausible. It is undeniable.

---

[8] See **Exhibit 7**, Urgent Medical Device Correction, referenced in the Complaint, expanding the recall which the FDA advised occurred February 7, 2022, but the Notice is dated April 7, 2022.

***Design Defect***

The finned tibial tray was defective because it did not fit with the other components of the Optetrak knee and provided inadequate bone support. The defect is addressed in an ongoing "Whistleblower" suit in another jurisdiction. Regarding the Optetrak Knee Design the Exactech Urgent Medical Device Correction also states:

> "The use of these non-conforming bags may enable increased oxygen diffusion to the UHMWPE (ultra-high molecular weight polyethylene) insert, resulting in increased oxidation of the material relative to inserts packaged with the specified additional oxygen barrier layer. Over time, oxidation can severely degrade the mechanical properties of conventional UHMWPE, which, in conjunction with other surgical factors, can lead to both accelerated wear debris production and bone loss, and/or component fatigue cracking/fracture, all leading to corrective revision surgery."

The point at which manufacturing defect combines with design defect is degradation of the plastic, and the accelerated wear debris production, bone loss and component fatigue and failure. Online marketing materials show that other manufacturers, like Stryker, use metal inserts.

***Non-conformity to express warranty***

At the time Defendant applied for the 510(k) premarket approval of its Optetrak Knee Replacement System with the defective insert, Defendant warranted that all components would be supplied, properly packaged according to specifications, and Defendant would conduct package validation testing. Defendant failed to perform the package testing over the course of sales from 2004 through 2022.

Exactech warranted that it would comply with 21 CFR Part 820 of the FDA regulations for Current Good Manufacturing Practice (cGMP) requirements to ensure safety and

effectiveness of its medical devices, including packaging of finished devices under subpart K and L (subsection 130, 140, 150 of part 820).  Exactech violated this warranty.

Exactech, in its marketing and advertising, warranted prolonged use and less polyethylene wear from the Optetrak as compared to other manufacturers' devices.  Exactech breached this warranty.

Exactech was both manufacturer and seller of the Optetrak Knee Replacement System and warranted against redhibitory defects regarding defective components when used.

## <u>CONCLUSION</u>

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In this case, the plaintiff has met her burden. Further, the facts support a finding that her claims are not prescribed. Accordingly, Mrs. Billups respectfully requests this Honorable Court deny the Motion to Dismiss.

Respectfully submitted,

GERTLER LAW FIRM, LLP

Dated:  July 15, 2022

/s/ Helen H. Babin                        .
M. H. GERTLER #06036
LOUIS L. GERTLER #23091
HELEN H. BABIN #22730
935 Gravier Street, Suite 1900
New Orleans, LA  70112
(504) 581-6411
mhgertler@gertlerfirm.com
lgertler@gertlerfirm.com
hbabin@gertlerfirm.com